# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FELICIA SMART,

            Plaintiff,

    v.

GEISINGER HEALTH,

            Defendant.

No. 4:20-CV-02198

(Chief Judge Brann)

## MEMORANDUM OPINION

### DECEMBER 20, 2022

Plaintiff Felicia Smart sues her former employer, Geisinger Health, for discriminating against her because she was disabled and because she took leave pursuant to the Family Medical Leave Act ("FMLA").[1] Geisinger now moves for summary judgment on Smart's claims. For the reasons that follow, Geisinger's motion will be granted.

## I.    BACKGROUND

### A.    The Events Leading to Smart's Disability

Smart began working for Geisinger in October 2015 as a temporary call center patient representative.[2] She became a full-time employee in May 2016, answering

---

[1]    29 U.S.C. § 2601 *et seq.* (1993).

[2]    Dep. of Felicia Smart, Doc. 33-6 at 12:21-13:14. Smart's deposition was filed with the Court in four different ECF documents. *See* Docs. 33-6, 33-7, 33-8, 33-9. The first two contain her deposition; the latter two contain the exhibits referenced during the deposition.

phone calls from patients while working from home.[3] In the summer of 2018, Nicole Dietrick became Smart's supervisor.[4] In January 2019, Smart fell and hit her head, resulting in a concussion, for which she took a week off from work with Geisinger's approval.[5] After the week off, she returned to work.[6]

In April 2019, Smart began to suffer further health issues from the concussion.[7] Beyond asking for a week off and requesting assistance with a workplace assessment, Smart could not recall whether she requested any additional accommodations from Geisinger but maintains that Geisinger did not accommodate her.[8] Smart cannot recall the substance of the assessment, but recalls having difficulty reading it, so a Geisinger employee read the assessment to her, resolving her difficulties.[9]

In April 2019, after visiting the emergency room for health issues from the concussion, Smart requested FMLA leave through Matrix, a third-party vendor Geisinger used to manage its employees' leave.[10] Her medical provider filled out a

---

[3]   *Id.* at 13:16-19; Dep. of Nicole Dietrick, Doc. 33-10 at 12:23-13:7.

[4]   Smart Dep., Doc. 33-6 at 14:17-15:14; Dietrick Dep., Doc. 33-10 at 10:5-19.

[5]   Smart Dep., Doc. 33-6 at 27:16-29:6.

[6]   *Id.* at 30:6-8.

[7]   *Id.* at 30:9-31:3

[8]   *See id.* at 32:4-33:14

[9]   *Id.* at 34:3-15.

[10]   *Id.* at 36:3-40:15; Doc. 33-8 at 28-30. Smart generally acknowledges using the Matrix system to request FMLA leave, but she does not recall whether she filled out the form or the specific information she provided to Matrix. *See* Smart Dep., Doc. 33-6 at 40:3-18. At the time, her health issues affected her memory. *See id.* She acknowledges that the form correctly states her position with Geisinger, her full-time status, her work schedule, and her supervisor. *See id.* at 40:16-41:20.

form on her behalf requesting leave from April 9, 2019, to May 7, 2019, and sent it to Geisinger.[11]

On April 15, 2019, Geisinger sent Smart a letter regarding her leave eligibility but not approving her requested leave.[12] The letter listed both Smart's email and home address.[13] Smart denies receiving the letter but acknowledges that she read the substance of the letter on the Matrix website or application.[14] She explained that at the time, she did not check her email.[15] The letter stated that Geisinger would hold Smart's position open for up to twelve weeks pursuant to the FMLA, but that she would not have the right to return to the same position if she was out longer than twelve weeks.[16] Smart does not recall whether she reviewed that particular information regarding the length of her protected leave on the Matrix website.[17]

On May 3, 2019, Geisinger sent Smart a letter granting her request to extend her leave until May 12, 2019.[18] Despite the presence of her email and home address on the letter, Smart denies receiving it but agrees that she was approved for FMLA leave for the period described in the letter.[19] She again expressed that she was not checking her email at the time.[20] However, she acknowledged that she was in contact

---

[11] Matrix FMLA Form, Doc. 33-8 at 31-34.
[12] *Id.* at 36-38.
[13] *Id.*; Smart Dep., Doc. 33-6 at 54:12-55:6.
[14] Smart Dep., Doc. 33-6 at 53:10-54:11.
[15] *Id.* at 54:23-55:6.
[16] April 15, 2019 Letter, Doc. 33-8 at 36-37.
[17] Smart Dep., Doc. 33-6 at 56:7-20.
[18] May 3, 2019 Letter, Doc. 33-8 at 39-40; Smart Dep., Doc. 33-6 at 61:19-25.
[19] Smart Dep., Doc. 33-6 at 61:1-12
[20] *Id.*

with the Matrix employee managing her leave and denied requesting any additional accommodations beyond leave.[21]

### B. Smart's Correspondence With Geisinger Throughout Her FMLA Leave

On May 10, 2019, Geisinger sent another letter to Smart, granting her request for additional leave until May 20, 2019.[22] Smart again denies receiving the letter and was still not checking her email.[23] She acknowledges that she was approved for the period described in the letter.[24] Again, she did not request any additional accommodations beyond FMLA leave.[25]

On May 23, 2019, Geisinger sent another letter to Smart, informing her that she was approved for ten weeks of FMLA leave, up until June 17, 2019.[26] Smart denies receiving the letter but acknowledges that she was approved for leave through June 17, 2019.[27] Smart also denies receiving another letter that Geisinger sent her on May 28, 2019 informing her of her leave status.[28] But she acknowledges that if she required any leave beyond the date listed in the letter, she had to contact Matrix and submit additional medical certification.[29]

---

[21]  *Id.* at 58:10-16; 62:16-23.
[22]  May 10, 2019 Letter, Doc. 33-8 at 41-42.
[23]  Smart Dep., Doc. 33-6 at 63:6-14.
[24]  *Id.* at 63:15-22.
[25]  *Id.* 64:7-18.
[26]  May 23, 2019 Letter, Doc. 33-8 at 51-52
[27]  Smart Dep., Doc. 33-6 at 74:6-14.
[28]  *Id.* at 74:21-75:10; Doc. 33-8 at 53.
[29]  Smart Dep., Doc. 33-6 at 75:11-17.

On June 17, 2019, Geisinger sent yet another letter that Smart denies receiving.[30] The letter indicated that Smart could remain on leave until June 30, 2019, and Smart acknowledges that leave was approved until that day because someone informed her though the Matrix app.[31] She also explained that she periodically reached out to her supervisor, Dietrick, to give her updates.[32] But she never requested additional accommodations on those phone calls or through Matrix.[33] The same day, June 17, Smart's neurologist sent a letter to Geisinger informing it that Smart would be unable to return to work until July 1, 2019.[34] Smart acknowledged that her twelve weeks of FMLA would have been exhausted on July 1, 2019.[35]

On July 3, 2019, a Matrix employee reached out to Smart to find out whether she had returned to work on July 1, 2019, the day her doctor said she would be able to return.[36] Smart responded, explaining that she was still having health issues and that her doctor sent additional information to Geisinger.[37] Smart's neurologist sent to Geisinger a document indicating that Smart was suffering from a condition that

---

[30]   Doc. 33-8 at 54-55; Smart Dep., Doc. 33-6 at 75:20-76:8.
[31]   Doc. 33-8 at 54-55; Smart Dep., Doc. 33-6 at 76:12-77:24.
[32]   Smart Dep., Doc. 33-6 at 77:25-78:25.
[33]   *Id.*
[34]   Raumann Doctor's Note, Doc. 33-8 at 56.
[35]   Smart Dep., Doc. 33-6 at 80:4-22.
[36]   July 3, 2019 Email Exchange between Demi Carrero and Smart, Doc. 33-8 at 58-59. Smart expressed that these communications were the "texting app," but they appear to be emails between her and the Matrix employee. *See id.*; Smart Dep., Doc. 33-6 at 83:22-84:4.
[37]   July 3, 2019 Email Exchange between Demi Carrero and Smart, Doc. 33-8 at 58-59; Smart Dep., Doc. 33-6 at 85:14-86:12.

could potentially affect her for life and would require indefinite leave.[38] Smart denies that her doctor informed her of the potential duration of her condition.[39] But she acknowledged that, as of the end of June 2019, she was unable to perform her duties as a patient representative because she had difficulty speaking.[40] On July 10, 2019, Smart had an appointment with her neurologist.[41] Smart acknowledged that during this visit and after, she was unable to work.[42]

## C.   Events Following the Expiration of Smart's FMLA Leave

Smart's twelve weeks of FMLA leave expired on July 2, 2019.[43] At some point before July 12, 2019, Dietrick called Smart.[44] On the call, Dietrick explained to Smart that Geisinger was no longer going to hold her position open because the call center was understaffed.[45] At the time, Geisinger was facing staffing issues that affected its ability to meet its performance goals.[46]

Instead, Geisinger would place Smart on extended medical leave, which allowed her to remain a Geisinger employee and access certain benefits for up to one year.[47] Dietrick further explained that Geisinger was not terminating Smart, but that

---

[38]   Matrix Medical Certification, Doc. 33-8 at 63-65.
[39]   Smart Dep., Doc. 33-6 at 88:19-89:21.
[40]   *Id.* at 33-6 at 90:9-91:16
[41]   Smart Progress Note, Doc. 33-8 at 66-70.
[42]   Smart Dep., Doc. 33-6 at 96:2-97:5.
[43]   Aff. of Melissa Bowditch, Doc. 33-3 ¶ 6.
[44]   *Id.* at 115:17-120:17; Dietrick Dep., Doc. 33-10 at 24:6-25:19.
[45]   Dietrick Dep., Doc. 33-10 at 11:5-12:14, 15:4-17.
[46]   *See* Dietrick Dep., Doc. 33-10 at 15:9-20:10; Bowditch Aff., Doc. 33-3 ¶¶ 8-18; Aff. of Lori Laubach, Doc. 33-4 ¶¶ 13-19; Aff. of Charles Ducharm, Doc. 33-5 ¶¶ 12-22.
[47]   Bowditch Aff., Doc. 33-3 ¶¶ 12-17.

Smart would need to contact Geisinger's human resources department to find a new job with Geisinger.[48] On the call, Dietrick recalls giving Smart the phone number for Geisinger's human resources department.[49] Smart denies that Dietrick gave her a phone number to contact to find a new job with Geisinger.[50] Eventually, Geisinger hired new patient representatives, but it is unclear whether Smart's position was filled.[51] On the call, Dietrick also explained to Smart that Geisinger would need to retrieve her work computer so that it could be used by new employees Geisinger was planning on hiring.[52] On July 17, 2019, Dietrick went to Smart's home to retrieve her work computer.[53]

On July 12, 2019, Geisinger sent Smart a letter informing her that she was approved for "extended medical leave" from July 2, 2019 to August 18, 2019.[54] Smart recalled being approved for extended leave but did not recall the leave period ending on August 18.[55] Smart also did not recall receiving two additional letters from Geisinger regarding her leave: one on July 29, 2019, the other on September 20, 2019.[56] The September 20, 2019 letter informed Smart that she needed additional

---

[48]  *Id.*
[49]  Dietrick Dep., Doc. 33-10 at 24:11-25:19.
[50]  Smart Dep., Doc. 33-7 at 118:20-120:17.
[51]  Dietrick Dep., Doc. 33-10 at 29:10-30:19.
[52]  *Id.* at 32:16-33:11.
[53]  *Id.* at 37:18-23; Smart Dep., Doc. 33-7 at 124:12-18.
[54]  July 12, 2019 Letter, Doc. 33-8 at 71-72.
[55]  Doc. 33-7 at 101:9-23.
[56]  July 29, 2019 Letter, Doc. 33-8 at 74; September 20, 2019 Letter, Doc. 33-8 at 75; Smart Dep., Doc. 33-7 at 103:12-105:3.

medical certification for leave beyond August 19, 2019.[57] Smart denies ever requesting extended medical leave.[58]

An email exchange on July 12, 2019 between Smart and a Matrix employee indicates that Geisinger put her on extended leave because she had exhausted the twelve weeks guaranteed by the FMLA.[59] Smart does not recall receiving emails from Matrix and does not recall sending the emails attributed to her, but she does not appear to deny that she sent and received the emails.[60] Another exchange from August 13, 2019 indicates that Matrix informed Smart that the fact that Geisinger retrieved her computer did not mean she was terminated.[61]

Smart could not access Geisinger's internal job postings without her Geisinger computer, and any job inquiries sent to Geisinger externally were denied because she was listed as an employee in Geisinger's internal systems.[62] Smart claims that because she had no way of contacting Geisinger's human resources department, she instead reached out to temp agencies for employment options.[63] She further explains that she could not apply for additional Geisinger jobs without her work computer as

---

[57]   September 20, 2019 Letter, Doc. 33-8 at 75.
[58]   Smart Dep., Doc. 33-7 at 105:24-106:2.
[59]   July 12, 2019 Email Exchange Between Demi Carrero and Smart, Doc. 33-8 at 77.
[60]   Smart Dep., Doc. 33-7 at 106:14-111:7.
[61]   July 12, 2019 Email Exchange Between Demi Carrero and Smart, Doc. 33-8 at 78-80.
[62]   Smart Dep., Doc. 33-7 at 121:1-11.
[63]   *Id.* at 121:12-124:13.

Geisinger rejected her external inquiries into other jobs because its system recognized her as Geisinger employee.[64]

### D.    Procedural History

In her Complaint, Smart alleges that Geisinger discriminated against her on the basis of her disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count I) and the Pennsylvania Human Relations Act ("PHRA") 43 Pa. C.S. § 951 *et seq.* (Count III); and retaliated against her because she used her leave, in violation of the FMLA (Count II). Geisinger now moves for summary judgment on Counts I through III. That motion has been fully briefed and is ripe for disposition.[65]

## II.    LAW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[66] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[67] A defendant "meets this

---

[64]   *Id.* at 115:1-7.
[65]   Geisinger MSJ Br., Doc. 31; Geisinger Statement of Facts ("SOF"), Doc. 32; Smart Opp. Br., Doc. 34-5; Smart Resp. to Geisinger's SOF "RSOF", Doc. 34-2; Geisinger Reply Br., Doc. 35.
[66]   Fed. R. Civ. P. 56(a).
[67]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

standard when there is an absence of evidence that rationally supports the plaintiff's case."[68] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[69]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[70] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[71] The United States Court of Appeals for the Third Circuit explains that the nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[72] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[73]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[74] a court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving

---

[68]  *Clark*, 9 F.3d at 326.

[69]  *Id.*

[70]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[71]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[72]  *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 252 (3d Cir. 2010).

[73]  *Port Authority of N.Y. and N.J. v. Affiliated FM Insurance Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).

[74]  *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

party."[75] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the court may "consider the fact undisputed for purposes of the motion."[76] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[77]

## III.   ANALYSIS

### A.   *McDonnell Douglas* Burden-Shifting Framework

For claims of discrimination and retaliation under the FMLA, ADA, and PHRA,[78] courts apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[79] Under that framework, the plaintiff "bears the initial burden of establishing a *prima facie* case by a preponderance of the evidence."[80] The "central focus" of the *prima facie* case in this context "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'"[81]

---

[75] *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[76] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[77] Fed. R. Civ. P. 56(c)(3).

[78] "The proper analysis under Title VII and the [PHRA] is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." *Weston v. Pennsylvania*, 251 F.3d 420, 425 n.3 (3d Cir. 2001), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *see also Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

[79] *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 302 (3d Cir. 2012) (citing *McDonnell Douglas Corp.*, 411 U.S. 792 (1973)).

[80] *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)).

[81] *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999) (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

If the plaintiff presents a *prima facie* case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for [her termination]."[82] Importantly, the shifting burden concerns only the evidentiary burden of production; "[the plaintiff] has the ultimate burden of persuasion at all times."[83] Specifically, the employer must "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."[84]

If the employer meets that burden, "the presumption of discriminatory action raised by the *prima facie* case is rebutted" and the burden shifts back to the plaintiff.[85] To sustain her claim, "[the plaintiff] then must establish by a preponderance of the evidence that [the employer's] proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action."[86] Specifically, the plaintiff must "provid[e] evidence that would allow a fact finder reasonably to (1) disbelieve [the company's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of [her termination]."[87]

---

[82]   *Sarullo*, 352 F.3d 797 (citing *McDonnell Douglas*, 411 U.S. at 802).
[83]   *Lichtenstein*, 691 F.3d at 302.
[84]   *St. Mary's Honor Center*, 509 U.S. at 507 (internal quotation marks and emphasis omitted).
[85]   *Sarullo*, 352 F.3d at 797 (citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).
[86]   *Id*.
[87]   *Id*. at 800 (internal quotation marks and citation omitted).

### B.    *Prima Facie* ADA Claim

To present a *prima facie* case of disability discrimination under the ADA and PHRA (Counts I and III), Smart needs to establish "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by [Geisinger]; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination."[88]

In support of its motion, Geisinger argues that Smart has not established a *prima facie* case under the ADA,[89] and even if she did, Geisinger had a legitimate nondiscriminatory reason for taking the alleged adverse employment action that Smart fails to show was pretextual.[90]

### 1.    Whether Geisinger Failed to Engage in the Interactive Process

Geisinger first argues that Smart never requested an accommodation beyond leave.[91] Smart argues that by taking away her work computer, Geisinger made it impossible for her to request accommodations.[92] She therefore argues that Geisinger failed to meaningfully engage in the required interactive process.[93]

---

[88]   *Taylor*, 184 F.3d at 306.
[89]   Geisinger MSJ Br., Doc. 31 at 3-14.
[90]   *Id.* at 14-18.
[91]   *Id.* at 3-6.
[92]   Smart Opp. Br., Doc. 34-5 at 8-11.
[93]   *Id.*

Federal regulations interpreting the ADA provide that in order "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation."[94] "[B]oth parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith."[95] In addition, "the interactive process must include sufficient notice to inform the employer that an employee is requesting an accommodation followed by good faith participation of the employer and employee in that interactive process."[96]

To "hold his/her employer responsible for a breakdown in the interactive process under the ADA," the aggrieved employee must show:

1) the employer knew about the employee's disability;

2) the employee requested accommodations or assistance for his or her disability;

3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and

4) the employee could have been reasonably accommodated but for the employer's lack of good faith.[97]

---

[94]   29 C.F.R. § 1630.2(o)(3).

[95]   *Mengine v. Runyon*, 114 F.3d 415, 420 (3rd Cir. 1997).

[96]   *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3d. Cir. 1999) *superseded by statute*, Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12101 *et seq.*, Pub. L. 110-325 (2008).

[97]   *Id.*

Geisinger does not appear to dispute Smart's disability or its knowledge of it.[98] The parties' arguments indicate that they dispute the second and third elements, which the Court next addresses.

As the plaintiff, Smart carries the burden to identify a reasonable accommodation.[99] She argues that Geisinger could have had her process pharmacy claims as a potential accommodation for her disability.[100] But she never communicated such a request to Geisinger.[101] Nor could she, given that she claims it was impossible to reach anyone at Geisinger without her work computer. Furthermore, she testified that no one in her position only processed pharmacy claims, it was just one of the many responsibilities of the position.[102] She does not identify any other accommodation. Despite Smart's contrary position,[103] after granting an employee their requested accommodation, nothing in the ADA requires an employer to ascertain what potential other unrequested accommodations might

---

[98] Geisinger SOF, Doc. 32 ¶¶ 31, 34, 47.

[99] *Fogleman v. Greater Hazleton Health All.*, 122 F. App'x 581, 585 (3d Cir. 2004) (citing *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 284 (3d Cir. 2001)).

[100] Smart Opp. Br., Doc. 34-5 at 9.

[101] *See* 29 C.F.R. pt. § 1630, app. 1630.9 at 359 ("*Once a qualified individual with a disability has requested provision of a reasonable accommodation*, the employer must make a reasonable effort to determine the appropriate accommodation." (emphasis added)).

[102] Smart Dep., Doc. 33-6 at 91:6-92:9.

[103] *See* Smart Opp. Br., Doc. 24-5 at 10 ("Defendant knew that Ms. Smart suffered a head injury and yet did nothing to determine if she needed an accommodation *after* taking FMLA leave and extended medical leave." (emphasis added)).

benefit an employee. The record is clear that Smart did not request an accommodation beyond leave.[104]

Next, the Court considers Smart's claim that she could not access Geisinger's internal systems to request any accommodations to be an argument that Geisinger did not make the good faith effort to assist her in seeking accommodations.[105] This argument is as unavailing as her first. Smart argues that after her work computer was removed, she had no way of contacting Geisinger whatsoever, despite her numerous attempts. First, her only evidence in support are her own unsubstantiated assertions, which are insufficient to survive summary judgment.[106] Second, those assertions are undermined by her own testimony.

The record contains nine letters that Geisinger claims to have sent Smart. Each contains information regarding her leave and contact information for both the Matrix employee managing her leave and a phone number for Geisinger's human resources department.[107] The Court will—as is required on this motion—infer in her favor that she did not receive any of the nine letters by mail, although it notes that each letter

---

[104] *See* Smart Dep., Doc. 33-6 at 29:2-30:5, 33:4-34:15, 62:16-23, 64:7-18, 67:10-15, 74:15-20, 78:11-25.

[105] *See Taylor*, 184 F.3d at 319-20.

[106] *See Gonzalez v. New Jersey Dept. of Children and Families*, 545 F. Supp. 3d 178, 200 (D.N.J. 2021) ("Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment." (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990))

[107] *See* Doc. 33-8 at 36-38, 39-40, 41-42, 51-52, 54-55, 71-72, 74, 75-76.

was addressed correctly.[108] But the letters were also sent by email. And Smart repeatedly states that she was not checking her email at the relevant times.[109]

Smart appears to have two email addresses. The first, an AOL.com address, is the one she gave Matrix and the one listed on each of the nine letters.[110] The second, an iCloud.com address, is the one she used when she contacted the Matrix employee managing her leave.[111] Smart fails to explain why she gave Matrix one email address that she appears to have never checked instead of the address that she actively used to communicate with Matrix. In any event, her reason is immaterial. She did not check her email.

Although Smart claims that she had difficulties resulting from her condition, she was able to email Matrix several times regarding her leave.[112] Geisinger is not responsible for her failure to check her other email account. Furthermore, despite Smart's assertion that she had no way of contacting Geisinger by phone, she spoke to Dietrick over the phone to arrange for the retrieval of her computer.[113]

---

[108]  *See* Doc. 33-8 at 36-38, 39-40, 41-42, 51-52, 54-55, 71-72, 74, 75-76.

[109]  *See* Smart Dep., Docs 33-6 at 54:5-55:6 ("I was not even going on my email at that time. I was really sick. I wasn't looking at my emails at that time."), 61:1-6 ("If [the May 3, 2019 letter] went through email I was not reading my emails."), 63:10-13 ("No, like I said, I was not reading through emails."), 98:24-99:6 ("Like I said -- like I said before, I didn't look at my emails. It was really hard for me to pull them up. So I was really not feeling well. So I didn't read my emails. I was not looking at emails."); Doc. 33-7 at 103:22-104:1 ("Okay, so like I said, I wasn't reading my emails at that time.").

[110]  *See* Matrix Claim Intake Form, Doc. 33-8 at 1.

[111]  *See* July 12, 2019 Email Exchange Between Demi Carrero and Smart, Doc. 33-8 at 77-83.

[112]  *See id.*; July 8, 2019 Email Exchange Between Demi Carrero and Smart, Doc. 3308 at 58-60.

[113]  Smart Dep., Doc. 33-6 at 118:3-120:25; Dietrick Dep., Doc. 33-10 at 11:9-15:18.

The only genuine factual dispute the Court can discern is that Smart maintains that Dietrick did not give Smart the phone number for Geisinger's human resources department on their one phone call, while Dietrick says she did.[114] The Court will accept Smart's testimony as true, but it does not advance her argument. Each letter Geisinger sent to Smart by mail and email contained the phone number for human resources, but she did not check her email. Smart was also in active communication with the same Matrix employee who drafted those letters, and ostensibly had the phone number available in case Smart needed it. But Smart never asked that Matrix employee for the number. And finally, Smart had Dietrick's contact information, but failed to call her to ask for the number. Therefore, this factual dispute is not material.

The record indicates both that Smart had the ability to contact Geisinger and that Geisinger acted in good faith. Smart's reliance on language from the Third Circuit's decision in *Coneen v. MBNA American Bank, N.A.*, that "[i]f it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help," is misplaced.[115] Smart requested an accommodation, received it, and was repeatedly given the contact information to make additional requests. At no point did she even express an interest in finding a new position to anyone at Geisinger. Nor did she ever communicate that she was having difficulty requesting an accommodation or contacting Geisinger's human

---

[114] Smart Dep., Doc. 33-6 at 118:20-120:17; Dietrick Dep., Doc. 33-10 at 24:6-25:19.
[115] Smart Opp. Br., Doc. 34-5 at 10 (quoting 334 F.3d 318, 331 (3d Cir. 2003).

resources department. Her denials and averments that Geisinger did not accommodate her[116] are nothing more than legal conclusions "unsupported by documentation of specific facts" and are accordingly "insufficient to create issues of material fact that would preclude summary judgment."[117]

### 2. Whether Smart Was Qualified for Her Former Position

Geisinger next argues that Smart was not qualified for her old position.[118] In the context of the ADA, a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[119] To be qualified, a plaintiff must show that (1) she "satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires" and (2) she, "with or without reasonable accommodation, can perform the essential functions of the position held or sought."[120] In addition, an employee must establish that, with reasonable accommodation, they would be able to perform the functions of the job "in the near future."[121] Therefore, a request for indefinite leave is not a reasonable accommodation.[122]

---

[116] *See* RSOF, Doc. 34-2 ¶ 38.

[117] *SEC v. Bonastia*, 614 F.2d 908, 914 (3d Cir. 1980) (citing Fed. R. Civ. P. 56(e)).

[118] Geisinger MSJ Br., Doc. 31 at 10-11.

[119] 42 U.S.C. § 12111(8).

[120] *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 145 (3d Cir. 1998) (citing 29 C.F.R. pt. 1630, app. § 1630.2(m)).

[121] *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004) (citing *Criado v. IBM Corp.*, 145 F.3d 437, 444 (1st Cir. 1998).

[122] *Fogelman*, 122 F.3d at 586.

The Court agrees with Geisinger that an employee who is not medically cleared to return to work by their physician is not qualified under the ADA.[123] Smart testified at her deposition that she would not have been able to resume her job until she was off the medications prescribed to her by her doctor.[124] She is unsure of the date she could return, but maintains that it would have been at some point in July 2019, after Geisinger picked up her computer, which occurred on June 17, 2019.[125] But she never contacted any Geisinger employee to share that information.[126]

What was communicated to Geisinger is a medical certification from Smart's physician filled out on June 28, 2019, four days before Smart's FMLA leave expired. On that certification, Smart's physician indicated that the "probable duration" of her condition was her entire life, and that Smart would need "continuous leave" from April 23, 2019 to a date to be determined.[127] Furthermore, the certification explains that Smart had difficulty speaking, and Smart agrees that speaking was an essential part of her job.[128] Therefore, from Geisinger's perspective, Smart needed indefinite leave and could not perform the essential functions of her job.

Although Smart disagrees with her physician's characterizations, she never communicated her disagreement or contrary information to Geisinger. She again

---

[123] Geisinger MSJ Br., Doc. 31 at 10 (citing *Williams v. Pinnacle Health Family Care Middletown*, 852 F. App'x 678 (3d Cir. 2021)).
[124] Smart Dep., Doc. 33-7 at 103:3-11.
[125] *Id.* at 102:4-103:11.
[126] *See id.* at 163:3-164:15; 171:13-19.
[127] FMLA Healthcare Provider Certification, Doc. 33-8 at 62-65.
[128] *Id.*; Smart Dep., Doc. 33-6 at 90:22-91:9.

argues that Geisinger prevented her from informing it of her readiness to return. The Court has already rejected that argument. Therefore, there is no dispute that she was unqualified for the position.

### 3.    Whether Smart Suffered an Adverse Employment Action

Geisinger also argues that Smart did not suffer an adverse employment action.[129] Smart counters that the failure to reasonably accommodate her is an adverse employment action. She is correct that "[a]dverse employment decisions in [the ADA] context include refusing to make reasonable accommodations for a plaintiff's disabilities."[130] But an employer cannot refuse an accommodation that was never requested.

The fact that her old position was not held open for Smart is not an adverse employment action under the circumstances presented here. The Third Circuit confronted a similar situation in *Budhun v. Reading Hospital and Medical Center*, in which a plaintiff was not "formally terminated" but continued to receive some benefits, despite the fact that her employer filled her position with another employee and she could no longer return to it.[131] There, our Court of Appeals concluded that a jury could find that the plaintiff suffered an adverse employment action based on the employer's replacement of the plaintiff, the employer telling her to turn in her keys

---

[129]  Geisinger MSJ Br., Doc. 31 at 11-13.
[130]  *Williams v. Philadelphia Hous. Auth. Police Dept.*, 380 F.3d 751, 761 (3d Cir. 2004).
[131]  765 F.3d 245, 257-258 (3d Cir. 2014).

and badge, that she was not being offered another job with the company, and that she would be formally terminated if she was cleared to return to work.[132]

*Budhun* bears some similarity to the facts at hand as both employers essentially replaced the plaintiff-employee with another individual such that the plaintiff could no longer return to the job and took back the plaintiffs' computers. But other than those two similarities, Geisinger's response is distinguishable from the employer's response in *Budhun*. Here, Geisinger did offer to find Smart another role in the company when she was ready to return to work and did not tell her that she would be terminated if she was cleared to return. The Court views those differences as critical to determining whether Smart suffered an adverse employment action. Because there is no dispute that Geisinger was ready to work with Smart to find her a new position, the Court concludes that she did not suffer an adverse employment action.

### 4.     Whether Smart's Adverse Employment Action is Causally Linked to Her Disability

Geisinger argues that Smart cannot demonstrate any causal connection between her alleged adverse employment action and her disability.[133] Although Smart argues that she suffered an adverse employment action, she does not appear to make any arguments connecting that action to her disability. The Court will instead consider the argument she makes with respect to causation on her FMLA

---

[132]   *Id.*
[133]   Geisinger MSJ Br., Doc. 31 at 14.

claim, as both claims share a common factual predicate. Smart stands on the fourteen days between the expiration of her FMLA leave and Geisinger's retrieval of her work computer,[134] which the Court will consider an adverse employment action for the purposes of this analysis only.

As an initial matter, "[t]o the extent that [Smart] relies upon the brevity of the time periods between the protected activity and alleged retaliatory actions to prove causation, [s]he will have to show as well that the decision maker had knowledge of the protected activity."[135] She "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of [her] protected conduct at the time they acted."[136]

Here, the responsible decisionmakers appear to be Dietrick, Dietrick's supervisor, Charles Ducharm, and another human resources professional, Melissa Bowditch.[137] It appears that all Dietrick knew was that Smart hit her head and suffered from seizures in April 2019.[138] She appears to have been unaware of the duration, intensity, or treatment of Smart's condition. All of Smart's medical documentation went to Matrix, so Dietrick never had access to it.[139] It does not

---

[134] Smart Opp. Br., Doc. 34-5 at 14.

[135] *Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (citations omitted) (citing *Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)).

[136] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015)

[137] *See* Dietrick Dep., Doc. 33-10 at 29:10-31:12, 32:16-33:11, 38:17-39:1; Ducharm Aff., Doc. 33-5 ¶¶ 1-6; Bowditch Aff., Doc. 33-4 ¶¶ 1-9.

[138] *Id.* at 23:16-24, 28:8-29:3.

[139] *See id.* at 28:8-19.

appear that Ducharm or Bowditch knew anything about Smart beyond the fact that she was on FMLA leave. And the FMLA allows employees to take protected leave for a variety of reasons,[140] so the mere fact that Smart took FMLA leave would not put anyone at Geisinger on notice that Smart had a disability.

Even assuming that Geisinger knew Smart had a disability, fourteen days is longer than most periods considered sufficiently short to independently raise the inference of discrimination.[141] In any event, the Court must "review the whole record and not merely the length of time between protected activity and adverse action."[142] During the relevant period, the Court may consider "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus."[143]

On that point, Smart fails to identify any evidence supporting the inference of discriminatory animus. In fact, the record suggests the opposite conclusion: that Geisinger did what it could to support Smart. Therefore, Smart fails to establish a causal link between any alleged adverse employment action and her disability. As

---

[140] *See* 29 U.S.C. § 2612(a)(1) (listing the various reasons for which an employee can take FMLA leave).

[141] *See, e.g.*, *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 307 (3d Cir. 2012) (seven days); *Jalil.*, 873 F.2d at 708 (two days); *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (four days); *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (five days).

[142] *Harrison-Harper*, 788 F. App'x at 849.

[143] *LeBoon v. Lancaster Jewish Community Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007).

Smart has failed to establish a factual dispute on any of the elements of a *prima facie* ADA claim, summary judgment is appropriate on Counts I and II.

### C.   *Prima Facie* FMLA Retaliation Claim

To present a *prima facie* case of retaliatory discrimination under the FMLA, Smart must show (1) she is protected under the FMLA, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her exercise of her FMLA rights.[144] Her burden to show a causal nexus is lower on her FMLA claim is lower than her burden on her other claims—she need only prove that her use of FMLA leave was a "negative factor" in the company's decision to terminate her.[145] But even with that lower threshold, Smart still fails to establish a *prima facie* case.

Geisinger does not dispute the first element. As for the second, the Court's conclusion that she did not suffer an adverse employment action applies with equal force to her FMLA claim. As with her ADA claim, her failure to demonstrate an adverse employment action is fatal to her *prima facie* case. With respect to the last element, Smart again fails to establish a *prima facie* case for two reasons.[146]

---

[144] *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 151 (3d Cir. 2017).

[145] *Lichtenstein*, 691 F.3d at 301.

[146] Dietrick does not appear to have even known that Smart was on FMLA leave, characterizing it as "medical leave" in her deposition. Dietrick Dep., Doc. 33-10 at 13:8-18. But other individuals in Geisinger's human resources department knew that Smart was on FMLA leave. *See* Aff. of Melissa Bowditch, Doc. 33-3 ¶¶ 1-4.

First, Smart cannot use the date that Geisinger retrieved her computer as the relevant date for her claims of temporal proximity between Geisinger's adverse employment action and her FMLA leave. As Geisinger argues, the last element of an FMLA retaliation claim requires her to present evidence causally relating Geisinger's alleged adverse employment action to Smart's *invocation* of her FMLA rights.[147] Smart invoked her rights in April 2019, about two months before Geisinger retrieved her computer. That period is too long to raise any inference of retaliatory intent.

Second, Smart also fails to provide any evidence of retaliatory animus regarding her taking FMLA leave. Therefore, there are no issues of material fact that she has failed to present a *prima facie* case of FMLA retaliation. Summary judgment is accordingly appropriate on Count III.

### D.    Legitimate, Nondiscriminatory Reason

If a plaintiff makes out a *prima facie* case of disability discrimination under the ADA or FMLA retaliation, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for the alleged adverse employment action. Although the Court has concluded that Smart fails to present a *prima facie* case of disability discrimination, failure to accommodate, or FMLA retaliation, even if she succeeded, Geisinger offers a nondiscriminatory reason for the alleged adverse employment action. Its reason for retrieving Smart's computer and filling her

---

[147] *Capps*, 847 F.3d at 151.

position was its staffing needs in its call center, which it has supported with deposition testimony from Dietrick and affidavits from members of its human resources department.[148]

In particular, that evidence explains that in June 2019—when Smart was on FMLA leave—its service levels fell below its baseline, which required hiring new staff and taking back Smart's computer for those new employees.[149] The Court concludes that Geisinger has satisfied its burden of production for both Smart's ADA and FMLA claims and moves next to the pretext analysis.

### E.    Pretext

As Geisinger has met its burden to articulate a nondiscriminatory reason for its alleged adverse employment action, Smart now carries the burden to show that Geisinger's reason is pretextual for both her ADA and FMLA claims. To do so, Smart must submit evidence that: (1) "casts sufficient doubt upon each of the legitimate reasons proffered by [Geisinger] so that a factfinder could reasonably conclude that each reason was a fabrication"; or (2) "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of [the adverse employment action]."[150]

---

[148] *See* Dietrick Dep., Doc. 33-10 at 15:9-20:10; Bowditch Aff., Doc. 33-3 ¶¶ 8-18; Laubach Aff., Doc. 33-4 ¶¶ 13-19; Ducharm Aff., Doc. 33-5 ¶¶ 12-22.

[149] Ducharm Aff., Doc. 33-5 ¶¶ 12-22; Laubach Aff., Doc. 33-4 ¶ 13.

[150] *Fuentes v. Perskie*, 32 F.3d 759, 761 (3d Cir. 1994).

Smart "cannot simply show that [Geisinger's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."[151] Instead, she "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Geisinger's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that [Geisinger] did not act for [its asserted] non-discriminatory reasons.'"[152] Proving pretext presents a "difficult burden."[153] Smart fails to meet it.

With respect to both claims, Smart argues that Geisinger was inconsistent or contradicted itself in its reasoning because it claims it was understaffed but denied Smart the opportunity to return the work.[154] That argument relies on the same misapprehension of the facts that undermines nearly every other aspect of Smart's case: she *never* contacted Geisinger to inform it that she could return to work. Therefore, there is no inconsistency or contradiction in Geisinger's reason for replacing Smart and retrieving her computer. The onus was on Smart to contact Geisinger to find a new job. She failed to do so.

---

[151] *Id.* at 765.
[152] *Id.* (citation omitted).
[153] *Id.*
[154] Smart Opp. Br., Doc. 34-5 at 12-13,

The Court appreciates that Smart's condition impeded her memory and focus, and that her phone was apparently stolen from her. But those obstacles are not attributable to Geisinger. Therefore, Smart cannot demonstrate pretext. Summary judgment is accordingly appropriate.

## IV.    CONCLUSION

For the foregoing reasons, Geisinger's Motion for Summary Judgment is granted.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge